UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------
WELLSVILLE MANOR LLC,

                Plaintiff,

v.

GREAT AMERICAN INSURANCE COMPANY,

                Defendant.
---------------------------------------------------------------
GREAT AMERICAN INSURANCE COMPANY,

                Third-Party Plaintiff,

v.

BOOM CONSTRUCTION CORP.,

                Third-Party Defendant.
---------------------------------------------------------------
BOOM CONSTRUCTION CORP.,

                Fourth-Party Plaintiff,

v.

EVANSTON INSURANCE COMPANY,

                Fourth-Party Defendant.
---------------------------------------------------------------

**MEMORANDUM & ORDER**
22-CV-1229 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiff Wellsville Manor LLC ("Wellsville") commenced the above-captioned action on March 7, 2022, against Defendant Great American Insurance Company ("Great American"), alleging a breach of contract claim based on Defendant's failure to reimburse Plaintiff for

damages to Plaintiff's property, which Plaintiff asserts Defendant was required to do under the terms of Plaintiff's insurance policy. (Compl. ¶¶ 7–10, Docket Entry No. 1.)

On March 22, 2024, Defendant moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and Plaintiff cross-moved for summary judgment.[1] For the reasons discussed below, the Court denies both Defendant's and Plaintiff's motions for summary judgment.

**I. Background**

The following facts are undisputed unless otherwise noted.[2]

    **a. Factual background**

        **i. The policy**

Plaintiff operates a nursing home and assisted living facility at 4192A Bolivar Road, Wellsville, NY 14895 (the "Premises"). (Def.'s 56.1 Resp. ¶ 1.) Defendant issued a commercial property insurance policy to Plaintiff under policy MAC E558186, effective from February 7, 2021, through February 7, 2022 (the "Policy").[3] (*Id.* ¶ 3.) The Policy provides that Defendant

---

[1] (Def.'s Mot. for Summ. J. ("Def.'s Mot."), Docket Entry No. 44; Def.'s Mem. in Supp. of Def.'s Mot. ("Def.'s Mem."), Docket Entry No. 44-23; Pl.'s Opp'n to Def.'s Mot. ("Pl.'s Opp'n"), Docket Entry No. 48-1; Def.'s Reply in Supp. of Def.'s Mot. ("Def.'s Reply"), Docket Entry No. 45; Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), Docket Entry No. 46; Pl.'s Mem. in Supp. of Pl.'s Mot. ("Pl.'s Mem."), Docket Entry No. 46-3; Def.'s Opp'n to Pl.'s Mot. ("Def.'s Opp'n"), Docket Entry No. 49-4; Pl.'s Reply in Supp. of Pl.'s Mot. ("Pl.'s Reply"), Docket Entry No. 47.)

[2] (Def.'s 56.1 Stmt. ("Def.'s 56.1"), Docket Entry No. 44-22; Pl.'s Resp. to Defs.' 56.1 ("Pl.'s 56.1 Resp."), Docket Entry No. 48-2; Pl.'s 56.1 Stmt. ("Pl.'s 56.1"), Docket Entry No. 46-2; Def.'s Resp. to Pl.'s 56.1 ("Def.'s 56.1 Resp."), Docket Entry No. 49-3.)

[3] Plaintiff's disclosure statement states that the members of Wellsville Manor LLC are all residents of the State of New York, and the LLC was formed in New York State. (Pl.'s Corporate Disclosure Stmt., Docket Entry No. 9.) Defendant is a wholly owned subsidiary of American Financial Group, Inc., an Ohio Corporation, and its principal place of business is in Ohio. (Def.'s Corporate Disclosure Stmt., Docket Entry No. 10; Third-Party Complaint ¶ 1,

"will pay for direct physical loss of or damage to [the Premises] . . . caused by or resulting from any Covered Cause of Loss." (Policy 45, annexed to Decl. of Kevin Buckley ("Buckley Decl.") as Ex. 1, Docket Entry No. 44-2;[4] Def.'s 56.1 Resp. ¶ 4.)

Covered cause of loss is defined as "Risks of Direct Physical Loss unless loss is: (1) excluded in Section C. Exclusions; or (2) limited in Section D. Limitations." (Policy 47; Def.'s 56.1 Resp. ¶ 4.) The policy lists as an excludable cause of loss "[f]aulty, inadequate or defective . . . design, specifications, workmanship, repair, construction, renovation, remodeling, grading, [or] compaction." (Policy 52; Def.'s 56.1 Resp. ¶ 5.) The Policy states that "[Defendant] will not pay for loss or damage caused by or resulting from" this cause of loss, unless it results in a covered cause of loss, in which case "[Defendant] will pay for the loss or damage caused by that Covered Cause of Loss." (Policy 52; Def.'s 56.1 Resp. ¶ 5.)

As relevant here, Section D, which specifies the limitations to covered causes of loss, states:

> [Defendant] will not pay more than $10,000 for loss or damage to the interior of any building or structure or to the contents in the building or structure caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:
>
> a. the building or structure first sustains damage by a Covered Cause of Loss to its roof, excluding temporary coverings, or walls through which the rain, snow, sleet, ice, sand or dust enters[.]

(Policy 53; Def.'s 56.1 Resp. ¶ 5.)

In the event of loss or damage to the Premises, the Policy states that Plaintiff must:

---

Docket Entry No. 18.) Plaintiff requests damages of $600,000. Given that the parties are diverse and the damages exceed $75,000, the Court has jurisdiction pursuant to 28 U.S.C. § 1332(c)(1).

[4] Because the Policy contains inconsistent pagination, the Court refers to the page numbers assigned by the electronic case filing system.

3

> Take all reasonable steps to protect the [Premises] from further damage by a Covered Cause of Loss, and keep a record of [Plaintiff's] expenses necessary to protect the [Premises] from such a loss, for consideration in the settlement of the claim. . . . Also, if feasible, set damaged property aside and in the best possible order, for examination.

(Policy 38; Def.'s 56.1 Resp. ¶ 6.) The Policy also required that in the event of loss or damage, Plaintiff "must see that the following are done": (1) "[a]s often as may be reasonably required, permit [Defendant] to inspect the property proving the loss or damage"; (2) "permit [Defendant] to take samples of damaged and undamaged property for inspection, testing and analysis"; and (3) "[c]ooperate with [Defendant] in the investigation or settlement of the claim." (Policy 38; Def.'s 56.1 Resp. ¶ 6.) Finally, the Policy also required that in the event of loss or damage, Plaintiff "must resume all or part of [its] 'operations' as quickly as possible." (Policy 39; Def.'s 56.1 Resp. ¶ 6.)

### ii. The damage to the Premises

In June of 2021, Plaintiff retained Boom Construction Corp. ("Boom") to replace the entire roof at the Premises. (Def.'s 56.1 Resp. ¶ 7.) During the construction, Boom removed the permanent sea gravel ballast layer of the roof, which was one of four layers of the roof and the layer responsible for preventing upward movement of the roof membrane due to wind, and did not put down a replacement ballast.[5] (*Id.* ¶ 8; Def.'s 56.1 ¶¶ 5, 19; Pl.'s 56.1 Resp. ¶ 19.) Kori Boom, the principal of Boom, testified at his deposition that on June 28, 2021, a portion of the roof membrane during a storm came loose and had flipped up, and Defendant's expert agreed that the wind lifted up the membrane during the storm and allowed water to enter the premises. (Def.'s 56.1 ¶ 6; Pl.'s 56.1 Resp. ¶ 6; Def.'s 56.1 Resp. ¶ 15.) On June 29, 2021, Plaintiff

---

[5] Plaintiff disputes this only to the extent that it asserts that only a portion of the ballast had been removed. (*See* Pl.'s 56.1 Resp. ¶ 5 ("[N]ot all the ballast had been removed from the roof.").)

4

reported to Defendant that on the day before, a windstorm caused damage to the roof and thirteen rooms in the Premises. (Def.'s 56.1 ¶¶ 2, 4; Pl.'s 56.1 Resp. ¶¶ 2, 4.) On June 29, 2021, Boom began interior demolition, and on June 30, 2021, the thirteen affected patient rooms, the lounge, and the adjoining hallway in the Premises "had been completely demolished down to the studs," and the roof membrane had been removed from the premises and discarded. (Def.'s 56.1 ¶¶ 10–11; Pl.'s 56.1 Resp. ¶¶ 10–11.) Kori Boom testified that he was not directed to, and did not, photograph the conditions of the roof or the interior of the Premises, or wait for an inspection by Defendant, before beginning the work. (Def.'s 56.1 ¶ 14.) Plaintiffs do not dispute that Kori Boom testified to this, but assert that this is an inaccurate representation because "Mr. Boom chose to act independently and without direction of Plaintiff." (Pl.'s 56.1 Resp. ¶ 14.)

On July 12, 2021, Defendant's assigned independent adjuster, Kevin Lynch, performed his inspection of the loss, and on July 20, 2021, Defendant's retained engineer, Stu Morrison, performed an additional inspection. (Def.'s 56.1 Resp. ¶¶ 35, 37.) On September 28, 2021, Defendant issued a partial disclaimer of coverage for the loss and (1) advised Plaintiff that it violated the Policy's conditions by discarding the property proving the loss and damage prior to Defendant's inspection of the Premises, and (2) noted that the interior water damage was not caused by a covered cause of loss that damaged the roof on the date of loss, which meant that Plaintiff's claim fell within the Policy's rain limitation that limited coverage to $10,000. (Def.'s 56.1 ¶¶ 15, 16; Pl.'s 56.1 ¶¶ 15, 16.)

    **b.  Procedural history**

On March 7, 2022, Plaintiff commenced this action, alleging a breach of contract claim based on Defendant's refusal to reimburse Plaintiff for the damage to the Premises. (Compl. ¶¶ 7–10.) The parties engaged in discovery and completed fact discovery in August of 2023, and

expert discovery in November of 2023. (Mot. for Ext. of Time to Complete Discovery 2, Docket Entry No. 22; Order Extending Time to Complete Discovery dated May 26, 2023; Def.'s Pre-Motion Conf. Letter dated Nov. 21, 2023 at 1, Docket Entry No. 29.)

On March 30, 2023, Defendant filed a third-party complaint against Boom, claiming that Boom is liable to Defendant for any sum Wellsville may recover under this action. (Third-Party Complaint, Docket Entry No. 18.) On March 22, 2024, Boom filed a fourth-party complaint against Evanston Insurance Company ("Evanston"), alleging breach of contract and duty to defend based on Evanston's refusal to defend Boom in this action. (Fourth-Party Complaint, Docket Entry No. 42.)

On March 22, 2024, after discovery closed, Defendant moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and Plaintiff cross-moved for the same. (Def.'s Mot.; Pl.'s Mot.)

## II. Discussion

### a. Standard of review

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022) (quoting Fed. R. Civ. P. 56(a)). The court must "constru[e] the evidence in the light most favorable to the nonmoving party," *Radwan*, 55 F.4th at 113 (alteration in original) (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 358 (2d Cir. 2011)), and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Koral v. Saunders*, 36 F.4th 400, 408 (2d Cir. 2022) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a

genuine factual dispute exists." *Kee v. City of New York*, 12 F.4th 150, 167 (2d Cir. 2021) (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* The court's function is to decide whether, "after resolving all ambiguities and drawing all inferences in favor of the nonmovant, a reasonable jury could return a verdict for the nonmovant." *Miller v. N.Y. State Police*, No. 20-3976, 2022 WL 1133010, at *1 (2d Cir. Apr. 18, 2022) (first citing *Anderson*, 477 U.S. at 248; and then citing *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127, 129 (2d Cir. 2013)).

### b. The Court denies summary judgment to both Defendant and Plaintiff

Defendant argues that the Court should grant it summary judgment as to Plaintiff's breach of contract claim because (1) Plaintiff itself breached the conditions of the Policy by failing to preserve the allegedly damaged property for inspection and failing to cooperate and assist in Defendant's investigation of the claim, (Def.'s Mem. 11–16), and (2) even if Plaintiff did not breach the Policy, the rain limitation provision of the Policy applies to limit coverage to $10,000, (*id.* at 17–18, 21–24; Def.'s Opp'n 8–17).

Plaintiff argues that the Court should deny Defendant's motion and grant Plaintiff summary judgment because (1) it did not breach any conditions of the Policy, (Pl.'s Opp'n 3–12; Pl.'s Mem. 12–15), and (2) the rain limitation of the Policy does not apply, (Pl.'s Opp'n 13–15, 20–22; Pl.'s Mem. 8–11).

7

Under New York law,[6] a plaintiff alleging breach of contract must show "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *DeFlora Lake Dev. Assocs., Inc. v. Park*, 654 F. App'x 9, 10 (2d Cir. 2016) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)); *see also Frye v. Lagerstrom*, No. 20-3134, 2021 WL 4022695, at *4 (2d Cir. Sept. 3, 2021) (same); *Hudson & Broad, Inc. v. J.C. Penney Corp.*, 553 F. App'x 37, 38 (2d Cir. 2014) (same).

Under New York law, "[i]n construing policy provisions defining the scope of coverage pursuant to a policy of insurance, courts 'first look to the language of the policy.'" *Regency Condominium v. Dongbu Ins. Co., Ltd.*, 134 N.Y.S.3d 384, 385 (App. Div. 2020) (quoting *ABM Mgmt. Corp. v. Harleysville Worcester Ins. Co.*, 977 N.Y.S.2d 330, 332 (App. Div. 2013)). "[A]n insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract." *10012 Holdings, Inc. v. Sentinel Ins. Co., Ltd.*, 21 F.4th 216, 220 (2d Cir. 2021) (quoting *Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006)); *Goldberger v. Paul Revere Life Ins. Co.*, 165 F.3d 180, 182 (2d Cir. 1999) (same). If the terms are unambiguous, courts should enforce the contract as written. *See Parks Real Estate*, 472 F.3d at 42; *Goldberger*, 165 F.3d at 182 (quoting *Village of Sylvan Beach v. Travelers Indemnity Co.*, 55 F.3d 114, 115 (2d Cir. 1995)). However, if the contract is ambiguous, "particularly the language of an exclusion provision," the ambiguity is interpreted in favor of the insured. *See Goldberger*, 165 F.3d at 182 (quoting *Travelers Indemnity Co.*, 55 F.3d at 115); *see also Olin Corp. v. Certain Underwriters at Lloyd's London*, 347 F. App'x 622, 627 (2d Cir. 2009) ("[W]e must resolve any ambiguity 'in favor of the

---

[6] Both parties appear to agree that New York law applies. (*See* Def.'s Mem.; Pl.'s Mem.)

8

insured[.]'" (quoting *Goldberger*, 165 F.3d at 182)); *Pepsico, Inc. v. Winterthur Int'l Am. Ins. Co.*, 788 N.Y.S.2d 142, 144 (App. Div. 2004) ("[I]f the language of the policy is doubtful or uncertain in its meaning, any ambiguity must be resolved in favor of the insured and against the insurer." (citation omitted)); *see also Dean v. Tower Ins. Co.*, 19 N.Y.3d 704, 708 (2012) ("[A]mbiguities in an insurance policy are to be construed against the insurer." (alteration in original) (quoting *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 353 (1978))). An ambiguity exists where "the terms of an insurance contract could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000) (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d. Cir. 1997)); *see also Glob. Reinsurance Corp. of Am. v. Century Indemnity Co.*, 22 F.4th 83, 94 (2d Cir. 2021) (same).

However, where a condition in an insurance policy is "clear and unambiguous and stated in unmistakable language . . . it constitutes an express condition precedent that must be literally complied with before [the insured] may recover." *Seaport Park Condominium v. Greater N.Y. Mutual Ins. Co.*, 828 N.Y.S.2d 381, 384 (App. Div. 2007) (citations omitted); *see also Mt. Hawley Ins. Co. v. Van Cortland Vill. LLC*, No. 08-CV-10414, 2011 WL 5834255, at *8 (S.D.N.Y. Nov. 18, 2011) ("Express conditions must be literally complied with before a party to the contract may recover.").

### i. There is a genuine dispute of material fact as to whether Plaintiff breached the conditions of the Policy

Defendant argues that Plaintiff breached the conditions of the Policy by not preserving the allegedly damaged property for inspection. (Def.'s Mem. 11–16.) In support, Defendant

9

notes that the loss took place on June 28, 2021, Plaintiff notified Defendant of the loss on June 29, 2021, and "demolished the interior that same day and failed to preserve any of the roof that was damaged." (*Id.* at 14–16.) Defendant also contends that prejudice is not required to show that an insured breached the conditions of a policy requiring it to preserve damaged property,[7] but that regardless, Defendant was prejudiced because it "was unable to confirm the extent of the interior damage, or whether demolition down to the studs of the rooms was in fact necessary." (Def.'s Reply 4.) Defendant also argues that the conditions in the Policy that required Plaintiff to take all reasonable steps to protect the Premises from further damage and resume operations as quickly as possible do not trump the conditions of the Policy that it asserts Plaintiff violated, and regardless the conditions do not conflict under these circumstances, because Plaintiff does not identify any covered property that it protected from further damage by discarding the membrane and demolishing the interior within a day of the loss. (*Id.*)

Plaintiff argues that it did not breach the conditions of the Policy because (1) Defendant offers no facts to support its allegation that Plaintiff did not cooperate with Defendant in the investigation of the claim, (Pl.'s Opp'n 5–6), (2) the Policy does not require that Plaintiff make no repairs prior to Defendant's investigation, (*id.* at 6–7), (3) the circumstances of this case are distinguishable from the cases cited by Defendant where courts determined that conditions of the policies had been breached by the insured, (*id.* at 7–11), and (4) Defendant was not prejudiced by Plaintiff's quick repairs, inspected the property twice, and was able to determine the cause of the

---

[7] Plaintiff argues that Defendant must show that Plaintiff's failure to comply with the conditions of the Policy prejudiced Defendant in order for it to deny coverage. (Pl.'s Opp'n 8–9.) However, where "compliance with [a] requirement [in a policy] is a condition precedent to coverage, the insurer need not show prejudice." *Seaport*, 828 N.Y.S.2d at 384; *see also Mt. Hawley*, 2011 WL 5834255, at *8 (same).

10

loss, (*id.* at 8–9). Plaintiff contends that its actions were in furtherance of all the conditions of the Policy, including its duty to mitigate damages and resume its business as quickly as possible after a loss. (*Id.* at 11–12; Pl.'s Mem. 12–14.) Plaintiff also argues that Boom was responsible for disposing of the property, and not Plaintiff itself. (Pl.'s Mem. 15.)

The Policy required that Plaintiff (1) "if feasible, set damaged property aside and in the best possible order, for examination"; (2) "as often as may be reasonably required, permit [Defendant] to inspect the property proving the loss or damage"; (3) "permit [Defendant] to take samples of damaged and undamaged property for inspection, testing and analysis"; and (4) "[c]ooperate with [Defendant] in the investigation or settlement of the claim." (Policy 38.) These provisions unambiguously imposed upon Plaintiff the obligations to, if feasible, "set the damaged property aside for examination and to permit [Defendant] to inspect the damaged property as often as reasonably required, in order to determine whether the loss was covered." *Seaport*, 828 N.Y.S.2d at 383 (finding unambiguous nearly identical provisions that required the plaintiff to "[i]f feasible, set the damaged property aside and in the best possible order for examination," and "[a]s often as may be reasonably required, permit [the defendant] to inspect the property proving the loss or damage").

The parties do not dispute that the day after the damage took place, and the same day Plaintiff notified Defendant of the damage, Boom began interior demolition on the thirteen affected rooms, lounge, and adjoining hallway, which were "completely demolished down to the studs." (Def.'s 56.1 ¶ 10; *see also* Pl.'s 56.1 Resp. ¶ 10.) The parties also do not dispute that Boom removed and discarded the roof membrane that had reportedly flipped up and resulted in the rain damage. (Def.'s 56.1 ¶¶ 11, 14; Pl.'s 56.1 Resp. ¶¶ 11, 14.)

11

The parties do dispute, however, whether it was feasible for Plaintiff to have preserved the entirety of the damaged property for inspection by Defendant.  (Pl.'s Mem. 15; *see also* Pl.'s 56.1 Resp. ¶ 14 (asserting that testimony that Boom was "not directed to photograph the conditions of the roof or the interior of the Premises, or wait for an inspection" before beginning his work was "an inaccurate representation of the chain of events" because "Mr. Boom chose to act independently and without direction of Plaintiff").)  There is evidence in the record to support Plaintiff's assertion that Boom acted without direction from Plaintiff in removing the membrane and disposing of it, and in beginning interior demolition.  (*See, e.g.*, Tr. of Dep. of Kori Boom ("Boom Tr.") 65:22–66:3, annexed to Buckley Decl. as Ex. 8, Docket Entry No. 44-9 (noting that when Boom saw the condition of the building the morning after the loss, "[n]obody was thinking about evidencing this.  We were just concerned about getting the inside protected"); *id.* at 60:22–61:6 (stating that Boom "got there the next morning, went directly to the roof, [and saw] the damaged area" and then "sent two guys to the local hardware store"); *id.* at 70:22–71:1 (noting that Boom got to the Premises "right at first light" the morning after the storm to put tarps down); *id.* at 74:15–21 (in response to whether he discussed his plan with anyone when he "went inside the building," Mr. Boom testified "I think we just asked [Wellsville's maintenance director] and [Kane] if we could help.  I'm sure I told [Kane] that we did as much as we could on the roof until the storm subsided"); *id.* at 85:7–13 (stating that no one informed Mr. Boom to photograph the conditions or wait for an inspection before beginning work); Tr. of Dep. of Hunter Kane ("Kane Tr.") 92:11–16 (when asked "who was responsible for [the] mitigation effort" for the interior of the Premises, stating that "[a]t the beginning of it, it was [Mr. Boom]"); *id.* at 93:20–94:4 (stating that he "believe[d]" Mr. Boom gave the order to remove the sheetrock and framing in the interior rooms).)  There is also evidence in the record, however, that Plaintiff

12

gave Boom direction to begin the demolition of the interior of the building. (*See, e.g.*, Boom Tr. 75:17–76:1 (responding to the question of whether he received "any direction from" Wellsville's maintenance director or Kane with regard to work they wanted Boom to do in the interior of the Premises, and stating "[y]eah, they asked me to . . . start the cleanup and . . . remove the damage and whatnot"); *id.* at 83:9–23 (stating that Boom was "given permission to start taking walls and stuff out" by Kane); *id.* at 98:24–99:6 (stating that Boom was given a directive from Kane to demolish the interior); Kane Tr. 97:21–98:7 (stating that Kane and Boom came to an agreement "before the demolition started" that it was "at [Mr. Boom's] discretion to demolish and remove the interior of the north wing").)[8]

There is therefore a genuine dispute of material fact as to whether it was "feasible" for Plaintiff to have set aside the damaged property, and therefore whether it breached the conditions of the Policy.[9]

---

[8] The Court notes that the facts here are distinct from those at issue in *Seaport*, where the court concluded that the plaintiff's failure to direct its hired construction company to preserve damaged property resulted in a breach of the policy at issue. *See Seaport*, 828 N.Y.S.2d at 382–84 (granting the defendant's motion to dismiss where the company hired to perform the repairs to plaintiff's cooling tower, after being present at the meeting where plaintiff agreed to store a cooling tower and make it available to the defendant for further inspection, instead destroyed the cooling tower). In this case, unlike in *Seaport*, Boom was hired to make pre-loss repairs to the Premises, rather than being hired specifically to address the loss at issue. Based on the facts of the case, a reasonable jury could find that Boom began performing work on the Premises the morning after the loss with minimal or no direction from Plaintiff in an attempt to mitigate the damage, pursuant to its initial contract.

[9] Plaintiff's argument that, in order to comply with this condition of the Policy, it would have had to breach the conditions requiring it to mitigate its damages and resume operations as quickly as possible is unpersuasive. (Pl.'s Mem. 12–14.) At a minimum, Plaintiff has offered no evidence indicating why those conditions would have made it not feasible to have stored for inspection the roof membrane that allegedly flipped up and caused rain to enter the interior of the Premises, or why that would have prevented Plaintiff from performing the necessary construction to mitigate damage and resume operations.

13

### ii. There is a genuine dispute of material fact as to whether the rain limitation provision applies

Defendant argues that it is undisputed that the damage to the interior of the Premises was caused by rain, and therefore the damage falls within the rain limitation provision, limiting recovery to $10,000. (Def.'s Mem. 17; Def.'s Opp'n 8–11.) Defendant contends that the burden is therefore on Plaintiff to demonstrate that on the date of loss, a covered cause of loss, such as a windstorm, resulted in the damage through which rainwater entered, rather than faulty workmanship or any other excluded or limited cause. (Def.'s Mem. 18.) Defendant argues that Plaintiff has not met this burden because (1) on the date of the loss, the windstorm did not cause damage to the roof because the Premises was not covered by a "roof" where the roof was partially disassembled and Boom failed to install a temporary ballast or other mechanism to hold down the roof membrane, (*id.* at 18–21; Def.'s Opp'n 11–14), (2) the wind speed on the date of the loss is undisputed, and the evidence demonstrates that had the rock ballast still been on the roof, the winds on the date of loss would not have caused damage, and therefore the removal of the rock ballast was the reason for the damage from the windstorm, (Def.'s Mem. 21–23; Def.'s Opp'n 14–17), and (3) the Policy explicitly excludes coverage for loss or damage caused by or resulting from faulty workmanship, (Def.'s Mem. 23–24).

Plaintiff argues that the rain limitation provision of the Policy does not apply because the Premises had first sustained damage to the roof by a covered cause of loss before the wind and rain caused the damage. (Pl.'s Opp'n 13.) Plaintiff also argues that Defendant is incorrect that there was no "roof" on the day of the loss, because (1) the term "roof" is not defined in the Policy, (2) Defendant is improperly asking the Court to define "roof," an ambiguous term, in their favor, rather than in favor of the insured, and (3) none of the parties or experts in the action have ever taken the position that the roof without the rock ballast is no longer a roof. (*Id.* at 13–

14

15).  Plaintiff contends that under the terms of the Policy, the wind caused the loss, not the removal of the rock ballast from the roof, because (1) the Policy makes no requirement of any minimum level of wind or weather conditions, (2) the roof on the Premises, even without the rock ballast, was considered a roof, and (3) Defendant's argument that rain entered the building under normal and expected weather conditions is not only wrong, but also irrelevant when it comes to coverage under the Policy.  (*Id.* at 20–21.)  Plaintiff also argues that the faulty workmanship exclusion does not apply here because the predominate cause of the damage was the wind itself.  (*Id.* at 21–22; Pl.'s Mem. 8–11.)

### 1.   There was a "roof" on the Premises on the day of the loss

Under the Policy, the rain limitation will apply unless the Premises "sustain[ed] damage by a Covered Cause of Loss to its roof, excluding temporary coverings, . . . through which the rain . . . enter[ed]."  (Policy 53.)  The fully compiled roof of the Premises consisted of four layers.  (Def.'s 56.1 ¶ 19; Pl.'s 65.1 ¶ 19.)  Defendants assert that the term "roof" unambiguously covers only the fully assembled roof at the Premises, but Plaintiff contends that the term "roof" is ambiguous, and may be read to include the roof of the Premises with one of the layers — here the permanent ballast — removed.  (Def.'s Mem. 18–21; Pl.'s Opp'n 13–15.)

The Court finds that the removal of the permanent ballast is insufficient to establish that there was no roof on the Premises the day of the loss.  First, "roof" is not defined in the Policy.  Second, it is defined in the dictionary as "the cover of a building," *Roof*, Merriam-Webster, https://www.merriam-webster.com/dictionary/roof (last visited Sept. 23, 2024), or "the covering that forms the top of a building," *Roof*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/roof (last visited Sept. 23, 2024).  Under these definitions, the three remaining layers of protection, even without the permanent ballast,

15

were sufficient to constitute a covering over the Premises such that there was a "roof" on the Premises the day of the loss.

Third, Defendant argues that *Nooney v. Tower Grp. Cos.*, No. 15267, 2009 WL 6451982 (N.Y. Sup. Ct. Sept. 23, 2009), and *Lobell v. Graphic Arts Mutual Insurance Co.*, 921 N.Y.S.2d 306 (2011), support its assertion that without the ballast, the roof did not meet the definition of a "roof" for purposes of the rain limitation provision. (Def.'s Mem. 19.) In both cases, however, the plaintiff either made openings in the roof or removed the roof in its entirety, and then covered the opening with a tarp. *See Nooney*, 2009 WL 6451982, at *1; *Lobell*, 921 N.Y.S.2d at 307. The courts in those cases determined that a tarp did not constitute a "roof" for the purpose of the relevant provision of the respective policies, and therefore the damage to personal property caused by the rain that entered the buildings at issue was not covered under the policies. *Nooney*, 2009 WL 6451982, at *1; *Lobell*, 921 N.Y.S.2d at 308. Unlike in those cases, the roof of the Premises was not removed in full before the loss — the parties do not dispute that there were four layers of the roof at the Premises, and that at most the top ballast of the roof was removed, leaving significantly more of the roof structure than the tarp used to cover the buildings at issue in *Nooney* and *Lobell*. (Def.'s 56.1 ¶¶ 5, 19; Pl.'s 56.1 ¶¶ 5, 19.)

Finally, even if the Court were to conclude that the term "roof" is ambiguous and subject to two meanings, the Court is required to construe the term in favor of Plaintiff. *See, e.g.*, *Olin Corp.*, 347 F. App'x at 627 ("[W]e must resolve any ambiguity 'in favor of the insured[.]'" (quoting *Goldberger*, 165 F.3d at 182)); *Pepsico*, 788 N.Y.S.2d at 144 ("[I]f the language of the policy is doubtful or uncertain in its meaning, any ambiguity must be resolved in favor of the insured and against the insurer."); *Dean*, 19 N.Y.3d at 708 ("[A]mbiguities in an insurance policy are to be construed against the insurer." (alteration in original) (quoting *Breed*, 46 N.Y.2d

16

at 353). The Court therefore finds that the membrane and remaining two layers were sufficient to constitute a "roof" within the meaning of the roof limitation provision of the Policy.

### 2. There is a dispute of material fact as to whether the windstorm or faulty workmanship was the cause of the loss

The Court also finds that there is a dispute of material fact as to whether the windstorm or faulty workmanship was the cause of the loss, and therefore denies summary judgment.

"Under an all-risk property damage policy, where multiple perils work together to cause the same loss, and one or more of those perils is covered under the policy, . . . the loss will be covered if the 'proximate, efficient and dominant cause' of the loss is covered by the policy." *Greenberg v. Privilege Underwriters Reciprocal Exch.*, 93 N.Y.S.3d 686, 688 (App. Div. 2019) (quoting *Album Realty Corp. v. Am. Home Assur. Co.*, 80 N.Y.2d 1008, 1010 (1992)); *see also Mirasco, Inc. v. Am. Nat. Fire Ins. Co.*, 144 F. App'x 171, 173 (2d Cir. 2005) ("An event 'causes' a loss within the meaning of [a] policy if it is the proximate cause of that loss."); *Coney Island Auto Parts Unlimited, Inc. v. Charter Oak Fire Ins. Co.*, No. 13-CV-1570, 2014 WL 3958080, at *8 n.5 (E.D.N.Y. Aug. 13, 2014) (applying New York law and noting that where a policy "exclude[s] damage 'caused by or resulting from' specified events," the court must "analyze whether an excluded event was the proximate or dominant cause of the loss"); *Home Ins. Co. v. Am. Ins. Co.*, 537 N.Y.S.2d 516, 517 (App. Div. 1989) ("The phrase 'caused by . . . [or] resulting from' in reference to an excluded peril requires that the insurer prove that the excluded peril . . . is the proximate cause of the loss.") (alteration in original) (quoting *Pan Am. World Airways, Inc. v. Aetna Casualty & Surety Co.*, 505 F.2d 989, 1006 (2d Cir. 1974))). "The efficient proximate cause of a loss is the cause that originally sets other events in motion," but a court "must not . . . examine or identify 'the event that merely set[s] the stage for [a] later event.'" *Parks Real Estate*, 472 F.3d at 48 (first quoting *Kula v. State Farm Fire & Cas. Co.*,

17

628 N.Y.S.2d 988, 991 (App. Div. 1995); and then quoting *Kosich v. Metro. Prop. & Cas. Ins. Co.*, 626 N.Y.S.2d 618, 618 (App. Div. 1995)). "When the court interprets an insurance policy excluding from coverage any injuries 'caused by' a certain class of conditions, the causation inquiry stops at the efficient physical cause of the loss; it does not trace events back to their metaphysical beginnings." *Id.* at 48 (quoting *Kimmins Indus. Serv. Corp. v. Reliance Ins. Co.*, 19 F.3d 78, 81 (2d Cir. 1994)); *Album Realty Corp.*, 80 N.Y.S.2d at 1010–11 ("[I]n [the] insurance context, a causation inquiry does not trace events back to their 'metaphysical beginnings'" (first alteration in original) (quoting *Home Ins. Co.*, 537 N.Y.S.2d at 516)).

The parties do not dispute that Boom removed the permanent ballast and did not put down any replacement protection, and that during the storm, wind lifted and tore the membrane, allowing rain to enter and causing the loss. (Pl.'s Mem. 11; Def.'s Mem. 22–23.) The parties do dispute, however, whether the wind was the proximate cause of the loss, which would result in an exception to the rain limitation, or whether Boom's failure to put down a temporary ballast was the proximate cause of the loss, which would fall within the faulty workmanship exclusion in the Policy and preclude coverage. (Pl.'s Mem. 11; Def.'s Mem. 22–23.) Plaintiff points to evidence in the record indicating that the removal of the ballast would not have been an issue in the absence of a wind storm. (*See* Pl.'s Mem. 11; Tr. of Dep. of Paul Angelides ("Angelides Tr.") 23:13–15, annexed to Buckley Decl. as Ex. 13, Docket Entry No. 44-14 ("[I]f you remove the ballast and there is not much wind, there is nothing to worry about."); *id.* at 24:23–25:3 ("[W]hen the wind — when the unballasted roof membrane was subject to a wind force, it was damaged.").) There is also evidence in the record, however, that the wind during the storm was not at a level high enough to damage the roof if the ballast had been in place. (Def.'s Mem. 22–23; Angelides Tr. 23:9–19 ("If you remove the ballast and all of a sudden the wind starts to blow,

18

you're going to have a problem. Because nothing is holding the roof down against the higher wind force."); Tr. of Dep. of Richard Trieste ("Trieste Tr.") 55:13–23, annexed to Buckley Decl. as Ex. 14, Docket Entry No. 44-15 (confirming that a building would have to be able to withstand forces from wind of at least forty miles an hour, and that "if the ballast portion of the roof had remained in place . . . it would have resisted the force of the wind and there would have been no interior damage," "assuming that there wasn't any opening in the membrane prior to [the storm] . . . because the stone would resist the upward movement from the wind on the membrane").)

There is thus a dispute as to whether the windstorm or faulty workmanship was the proximate cause of the loss, such that summary judgment is precluded. *See, e.g.*, *John Mezzalingua Assocs., LLC v. Travelers Indem. Co.*, 182 N.Y.S.3d 408, 413 (App. Div. 2022) (affirming the denial of summary judgment where there were "multiple potential causes of the water entering [the] plaintiff's facility," and the defendants "failed to establish 'the proximate, efficient and dominant cause' of the loss" (quoting *Greenberg*, 93 N.Y.S.3d at 688)).

### III. Conclusion

For the foregoing reasons, the Court denies Defendant's motion for summary judgment and denies Plaintiff's motion for summary judgment.

Dated: October 1, 2024
      Brooklyn, New York

                                                                 SO ORDERED:

                                                                   s/ MKB
                                                              MARGO K. BRODIE
                                                              United States District Judge